**UNITED STATES DISTRICT COURT**
**EASTERN DIVISION OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | |
|---|---|
| CGB DIVERSIFIED SERVICES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 1:20-cv-00031-SRC |
| ) | |
| JEFF BAUMGART, *et al.*, ) | |
| ) | |
| Defendants. ) | |

<u>**Memorandum and Order**</u>

This matter comes before the Court on [42] Defendants' Motion to Dismiss Pursuant to

Federal Rule of Civil Procedure 12(b)(6).   The Court grants, in part, and denies, in part, the

Motion.

**I.     Background**

Diversified alleges that it fell victim to an elaborate scheme launched by its competitors

and former employees to steal Diversified's trade secrets and raid its employees.   Doc. 38 at ¶ 1.

Diversified alleges that Jeff Baumgart and other former Diversified employees departed the

company and immediately began working for NAU Country Insurance Company, one of

Diversified's competitors in the crop insurance industry, and QBE Insurance Corporation,

Country's corporate affiliate.   *Id.* at ¶¶ 1–6; Doc. 43 at pp. 1–2.   Baumgart and the other

employees purportedly misappropriated Diversified's trade secrets and now use them to solicit

business from Diversified's customers.   Doc. 38 at ¶¶ 4–6.   Diversified further contends the

former employees solicited other Diversified employees to join Country and QBE Insurance.

*Id*. at ¶¶ 5–6.   Diversified claims that these actions violated the non-compete, non-solicitation,

and confidentiality provisions in the former employees' employment agreements.   *Id*. at ¶ 3.

Diversified also alleges that Country and QBE Insurance schemed with the former Diversified

employees to acquire Diversified's trade secrets and solicit Diversified customers and employees, all while knowing these actions violated the employment agreements Baumgart and the other former employees had with Diversified.   *Id*. at ¶¶ 1–6.

Based on Defendants' conduct, Diversified asserts eleven claims, including:   1) breach of contract (against Baumgart); 2) misappropriation of trade secrets pursuant to the Defend Trade Secrets Act—18 U.S.C. § 1832; 3) misappropriation of trade secrets pursuant to the Missouri Uniform Trade Secrets Act—MO. REV. STAT. 417.450 *et seq*.; 4) breach of fiduciary duty (against Baumgart); 5) tortious interference with the Baumgart Agreement (against Country); 6) tortious interference with Diversified's contractual relations (against Country); 7) tortious interference with Diversified's business relationships and/or expectancy with its customers and agents (against Country); 8) tortious interference with the Baumgart Agreement (against QBE Insurance); 9) tortious interference with Diversified's contractual relations (against QBE Insurance); 10) tortious interference with Diversified's business relationships and/or expectancy with its customers and agents (against QBE Insurance); and 11) civil conspiracy (all Defendants).   Doc. 38.   Defendants move to dismiss all claims for failure to state a claim. Doc. 42.

## II.   Standard

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted."   The notice pleading standard of Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a plaintiff to give "a short and plain statement showing that the pleader is entitled to relief[.]"   To meet this standard and to survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citation omitted).   This requirement

2

of facial plausibility means the factual content of the plaintiff's allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). The Court must grant all reasonable inferences in favor of the nonmoving party. *Lustgraaf v. Behrens*, 619 F.3d 867, 872-73 (8th Cir. 2010). Ordinarily, only the facts alleged in the complaint are considered for purposes of a motion to dismiss; however, materials attached to the complaint may also be considered in construing its sufficiency. *Reynolds v. Dormire*, 636 F.3d 976, 979 (8th Cir. 2011).

When ruling on a motion to dismiss, a court "must liberally construe a complaint in favor of the plaintiff[.]" *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010). However, if a claim fails to allege one of the elements necessary to recover on a legal theory, the Court must dismiss that claim for failure to state a claim upon which relief can be granted. *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 355 (8th Cir. 2011). Threadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice. *Iqbal*, 556 U.S. at 678; *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). Although courts must accept all factual allegations as true, they are not bound to take as true a legal conclusion couched as a factual allegation. *Twombly*, 550 U.S. at 555 (internal quotations and citation omitted); *Iqbal*, 556 U.S. at 677–78.

## III.    Allegations in complaint

Under *Iqbal/Twombly*, the Court assumes the veracity of Diversified's well-pleaded factual allegations. *Iqbal,* likewise, does not require the Court to state here every well-pleaded factual allegation contained in the Complaint. The Court therefore provides the relevant factual allegations for the purposes of this Order.

Diversified alleges that Baumgart began working at Diversified around May 2001 and signed an employment agreement as a condition of employment.   Doc. 38 at ¶¶ 28–29.   This agreement purportedly included non-competition, customer non-solicitation, and confidentiality provisions.   *Id*. at ¶ 29.   In 2019, Baumgart also signed a document acknowledging receipt of the Employee Handbook, which among other things, required Baumgart to acknowledge that he would not disclose confidential information.   *Id*. at ¶¶ 42–47.

Baumgart worked for Diversified for 18 years, eventually becoming National Marketing Manager.   *Id*. at ¶¶ 2, 29.   In that role, Baumgart had access to Diversified's strategy for marketing, pricing, sales, agent communication, customer and agent services, and customer information and profiles.   *Id*. at ¶ 30.   He also had the responsibility of developing, implementing, and supporting Diversified's policies and practices for protecting its trade secrets and proprietary information.   *Id*. at ¶ 31.

Diversified alleges that three other former employees, Michael Gauer, Rich Morrison, and Kane Adams, worked in concert with Baumgart to carry the alleged "scheme" to steal Diversified's trade secrets and raid its employees.   *Id*. at ¶¶ 2–4.   Gauer, Diversified's Upper Midwest Marketing Regional Manager at the time of his departure in January 2020, began working for Diversified in September 2015.   *Id*. at ¶ 48.   On September 8, 2015, Gauer signed an employment agreement that purportedly contained non-solicitation, non-compete and confidentiality provisions.   *Id*. at ¶ 49.   Morrison, Diversified's Manager of Marketing Services at the time of his departure, began working at Diversified in or about October 2000.   *Id*. at ¶ 57.   As a condition of his employment, he signed an employment agreement purportedly containing non-solicitation, non-compete, and confidentiality provisions.   *Id*. at ¶ 58.   Adams, Diversified's West District Marketing Director at the time of his departure, began working at Diversified in 2007.   *Id*. at ¶ 66.   As part of his continued employment with Diversified, Adams

4

signed an employment agreement on December 15, 2017, purportedly containing non-solicitation, non-compete, and confidentiality provisions.   *Id*. at ¶ 67.

Around December 12, 2019, Baumgart, Adams, Gauer and his brother, Pat Gauer, met with Country personnel to discuss employment at Country and/or QBE Insurance.   *Id*. at ¶ 75. In mid-December 2019, Morrison met with Country personnel to discuss employment with Country and/or QBE Insurance.   *Id*.   Jim Korin, the President of Country, asked Baumgart to ask his team for information for Country's "modeling."   *Id*. at ¶¶ 76–77.   On December 20, 2019, Korin, through Baumgart, requested information from Gauer, Adams, and Morrison, as well as three other Diversified employees—Larry Copes, Jimmy Armistead, and Brian Long—to facilitate Country's hiring process and "modeling."   *Id*. at ¶ 77.   The requested information included "key members base and bonus compensation for last year, "[Copes's] and [Armistead's] agreements," and "ideas regarding [Baumgart's] team."   *Id*.

By December 20, 2019, Country had one or more of Diversified's employment agreements and had reviewed its contents.   *Id*. at ¶ 78.   On January 7, 2020, Doug Jakway, Senior Vice President, General Counsel, and Corporate Secretary of Country, requested the home addresses and personal telephone numbers of Baumgart, Gauer, Morrison, Adams, Copes, Armistead, and Long.   *Id*. at ¶¶ 76, 79.   Korin later personally made offers of employment to Baumgart, Morrison, Gauer, Adams, Copes, and Armistead.   *Id*. at ¶¶ 81–82.

On January 8, 2020, while still employed by Diversified, Baumgart told Gauer that he predicted their business at Country would be worth $500 million by the third year.   *Id*. at ¶ 98. Before resigning from Diversified, Baumgart texted Gauer that Country lacked some fundamental things they could bring, including a profit matrix, the DSA indicators (the meaning of which Diversified does not explain), and market summary reports.   *Id*. at ¶ 100.

5

Between January 17 and 23, 2020, Baumgart, Gauer, and Morrison discussed soliciting Diversified employees and that Country and QBE would pay bonuses for bringing over Diversified employees.  *Id*. at ¶¶ 127–129.   Before his departure, Baumgart solicited Vic Morrison and Roger Knott, both Diversified Regional Marketing Managers.  *Id*. at ¶ 130.   He also spoke with Armistead and Copes about leaving Diversified for Country.  *Id*. at ¶ 131.  Baumgart and Morrison agreed that if Armistead and Copes joined Country, it would lead to "lots" of money for Baumgart and Morrison.  *Id*.

On January 19, 2020, Gauer and Morrison exchanged text messages regarding soliciting business in North Dakota.  *Id*. at ¶ 119.   Morrison texted Gauer that he thought Gauer could not step foot in North Dakota for a year.  *Id*.   Gauer responded that he could not, but he could just turn Geoff Blegen, a Country marketing representative, "loose on them."  *Id*.   However, he stated that the customers "still call [Gauer] for everything anyway" and that he "gets credit one way or the other."  *Id*.   On January 19 and 22, 2020, Gauer and Baumgart discussed how Country will track "premiums coming in."  *Id*. at ¶¶ 120–121.   Baumgart stated that he had discussed how premiums will be accounted for with Korin.  *Id*. at ¶ 121.

On January 22, 2020, Baumgart downloaded 27 applications from the Diversified file management system to his Diversified laptop.  *Id*. at ¶ 102.   The applications included confidential information about Diversified's customers and their intentions regarding crop insurance for 2020.  *Id*. at ¶ 103.   Additionally, Diversified uses its propriety software to make recommendations for crop insurance levels, types and amounts, and the applications reflect the value added by Diversified's propriety software in creating specific plans for each customer.  *Id*.  Around 7:00 p.m. CST on January 23, 2020, Baumgart performed a factory reset of his Diversified laptop, which destroyed all data on the laptop regarding its use.  *Id*. at ¶¶ 102, 108.

6

Gauer and Morrison also took Diversified's confidential and proprietary information, putting "useful" information on flash drives.  *Id*. at ¶ 101.

Baumgart resigned from Diversified on January 24, 2020.  *Id*. at ¶ 106.  Gauer, Morrison, and Adams also resigned within minutes of Baumgart.  *Id.*  Baumgart, Gauer, Morrison, and Adams each began working at Country in positions that included job responsibilities substantially similar to those they each had at Diversified.  *Id*. at ¶¶ 113–116.

Since arriving at Country, the former employees have encouraged other Diversified employees to join Country or QBE Insurance, including Brian Long, Bradley Cessna, Nathan Lewsader, Brittany Cormany, and Kristi King.  *Id*. at ¶¶ 141-155.  Additionally, Morrison met with numerous Diversified customers or agents during the week of February 3, 2020, including Ristau Insurance Agency Inc., Simon Insurance & Auction Services, Peterson Insurance Services, and Mitzel Crop Insurance, Inc.  *Id*. at ¶ 124.

## IV.   Discussion

### A.   Breach of contract

Diversified asserts a breach of contract claim against Baumgart, alleging that he violated the customer non-solicitation, non-compete, and confidentiality provisions of his employment contract.  Doc. 38 at ¶¶ 156–164.  Defendants argue that Diversified failed to state a claim because the contractual provisions at issue are unenforceable under Louisiana law, which the parties agree governs the contract.    Doc. 43 at pp. 6–7; *see also* Doc. 38-1 at 2.

#### 1.   Non-competition and customer non-solicitation provisions

Louisiana law applies the same statutory requirements to non-compete and customer non-solicitation provisions.   Therefore, before evaluating those provisions, the Court provides the relevant Louisiana law applicable to non-compete and customer non-solicitation provisions.

"Louisiana has long had a strong public policy disfavoring noncompetition agreements between employers and employees." *SWAT 24 Shreveport Bossier, Inc. v. Bond*, 808 So. 2d 294, 297 (La. 2001).   The state codified its disfavor of non-competition agreements by enacting LA. REV. STAT. § 23:921 and its courts continue to "narrowly construe[] restrictive covenants, including non-competition and customer non-solicitation agreements." *Arthur J. Gallagher & Co. v. Babcock*, 703 F.3d 284, 288 (5th Cir. 2012).   For reasons explained more fully below, the Court applies the statute as it existed in 2001, when Baumgart signed his employment agreement. The relevant portion of the statute states, "[e]very contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this Section, shall be null and void."   LA. REV. STAT. § 23:921(A)(1) (2001).

However, the statute includes an exception to the general rule, providing that non-competition agreements may be valid if they comply with the requirements laid out in Section 23:921(C) (2001), which states:

> Any person, including a corporation and the individual shareholders of such corporation, who is employed as an agent, servant, or employee may agree with his employer to refrain from carrying on or engaging in a business similar to that of the employer and/or from soliciting customers of the employer within a specified parish or parishes, municipality or municipalities, or parts thereof, so long as the employer carries on a like business therein, not to exceed a period of two years from termination of employment.

Simply put, "a valid non-competition agreement may limit competition only in a business similar to that of the employer, in a specified geographic area, for up to two years from termination of employment." *O'Sullivan v. Sunil Gupta, M.D., LLC*, No. CV 17-609, 2017 WL 3438349, at *2 (E.D. La. Aug. 10, 2017) (citation omitted).   Defendants argue that the non-competition and customer non-solicitation provisions in the Baumgart Agreement do not comply with the

8

requirements set forth in Subsection (C), and thus must be found unenforceable.   Doc. 43 at pp. 6–7.

### a.     "Restrictive covenant" provision

Titled "Restrictive Covenant," Baumgart's employment agreement includes the following non-compete provision:

> If The Employee is discharged for cause, or if the employee voluntarily terminates his/her employment, The Employee also agrees that during his/her employment and for a period of one (1) year commencing on the last date of employment with the Employer, he/she will not engage in any employment or consulting with any company or his own company within the same industry as CGB Diversified Services, Inc., within the counties Alexander, Johnson, Union, Jackson, Perry and Williamson in the state of Illinois, Dunklin, Pemiscot, New Madrid, Mississippi, Stoddard, Scott, Bollinger, Cape Girardea[sic], and Perry in the state of Missouri, and Clay, Green, Mississippi, and Craighead in the state of Arkansas.

Doc. 38-1 at 5.   Defendants argue that the non-compete is unenforceable because it restricts Baumgart from even being employed by a competitor, which constitutes an overbroad restriction under the statute that warrants finding the provision null.   Doc. 43 at pp. 6–7.

Defendants' argument turns on which version of LA. REV. STAT. § 23:921 applies to the non-compete provision.   In a 2001 decision, the Louisiana Supreme Court stated that "the statute does not allow a flat prohibition of employment by a competitor . . . ."   *SWAT 24*, 808 So. 2d at 308 (La. 2001).[1]   However, amended in 2003, the statute now permits non-compete provisions to bar former employees from working for competitors.   LA. REV. STAT. § 23:921(D) (2003); *Clear Channel Broad., Inc. v. Brown*, 901 So. 2d 553, 556–57 (La. App. 4th Cir. 2005). Defendants argue that when evaluating enforceability, Louisiana courts apply the statutes as written at the time the parties entered into the agreement.   Doc. 13 at 5.   Thus, because

---

[1] *SWAT 24*'s interpretation of Section 23:921 focused on how the 1989 amendment to the statute impacted the scope of non-competes, but it failed to specify which version of the statute being interpreted. However, *SWAT 24* does explain that although the statute had been amended since 1989, "none of these later amendments have any particular relevance to the present case." *SWAT 24*, 808 So. 2d at 305 n.8 (La. 2001). Accordingly, *SWAT 24*'s interpretation of the statute as it relates to the scope of a non-compete agreement has equal application to the 2001 version.

Diversified alleges (and Defendants do not dispute) that Baumgart signed the agreement in 2001, the 2001 version of the statute should apply.   Therefore, Defendants argue that the 2001 version of Section 23:921 renders the provision in Baumgart's non-compete banning him from being employed by a competitor unenforceable.

The Court agrees with Defendants.   As one court explained, "[w]ith respect to the applicability of LA. REV. STAT. 23:921, the version of the statute that was in effect at the time that the employment agreement in question was executed shall be applied to determine whether the non-competition provisions contained therein are enforceable." *Choice Prof'l Overnight Copy Serv., Inc. v. Galeas*, 66 So. 3d 1216, 1220 (La. App. 4 Cir. 2011) (citing *Clear Channel*, 901 So. 2d 553 at 556−57).   Thus, the Court must apply the version of the statute in effect in 2001, the year Baumgart signed the agreement.

The 2001 version of Section 23:921 rendered unenforceable non-compete agreements that prohibited former employees from working for competitors.   *See Swat 24*, 808 So. 2d at 308.   Baumgart's employment agreement restricts him from "engag[ing] in any employment or consulting with any company or his own company within the same industry as CGB Diversified Services, Inc."   Doc. 38-1 at 5.   The first clause in the provision barring Baumgart from "engag[ing] in any employment or consulting" constitutes a "flat prohibition of employment by a competitor," which the Louisiana Supreme Court found "simply overbroad and therefore null and void."   *See SWAT 24*, 808 So. 2d at 308.   Thus, the provision's ban on Baumgart being employed at a competitor constitutes an overbroad restriction and therefore the Court finds it unenforceable.

Additionally, although the Baumgart Agreement contains a severability provision, severing the overbroad clause in the non-compete provision would not result in Diversified's stating a claim for breach of contract.   Severing the clause that bars employment with

10

competitors would result in the non-compete stating that Baumgart cannot operate his own

company in competition with Diversified.   But, Diversified does not allege that Baumgart

breached by forming his own competing business; rather the alleged breach occurred when

Baumgart began working as an employee for Country and QBE Insurance.   In short, Louisiana

law renders unenforceable the only portion of the non-compete that Diversified alleges Baumgart

breached, and thus Diversified fails to state a claim for breach of contract based on a violation of

the customer non-solicitation provision.   The Court therefore grants the motion to dismiss as to

this claim.

### b.      "Customer non-solicitation" provision

Baumgart's employment agreement includes the following customer non-solicitation

provision:

> If The Employee is discharged for cause, or if the employee voluntarily terminates
> his/her employment, The Employee agrees that in addition to any other limitation,
> during his employment and for a period of one (1) year commencing on the last
> date of employment with the Employer, he/she will not, on his/her behalf or on
> behalf of any other person, firm or corporation, call on any of the Diversified
> Services or Consolidated Grain and Barge Co. customers, or any of its affiliates or
> subsidiaries for the purpose of soliciting crop insurance, grain marketing services,
> or grain hedging or brokerage services and/or providing to any of these customers
> any customer information relating to the Employer's services, nor will the
> Employee in any way, directly or indirectly for himself/herself, or on behalf of any
> other person, firm or corporation, solicit, divert or take away any customer of the
> Employer, its affiliates or its subsidiaries.
>
> The Employee's right to compete has been limited only to the extent necessary to
> protect the Employer from unfair competition. However, reasonable people may
> differ in making this determination. If this restrictive covenant's scope or
> enforceability is disputed, a court or other trier of fact may modify and enforce the
> covenant to the extent necessary to be reasonable under these circumstances.

Doc. 38-1 at 4-5.   Defendants argue that the customer non-solicitation provision is

unenforceable because Section 23:921 (2001) requires customer non-solicitation provisions to

include express geographical restrictions and the one at issue here does not contain any such restrictions.   Doc. 43 at pp. 6–7.

Louisiana courts have consistently held that Section 23:921 (2001) applies to both non-compete and customer non-solicitation provisions.   *Vartech Sys., Inc. v. Hayden*, 951 So. 2d 247, 260–61 (La. App. 1 Cir. 2006)); *see also Johnson Controls, Inc. v. Guidry*, 724 F. Supp. 2d 612, 623 n.4 (W.D. La. 2010) ("Louisiana courts make no distinction between non-compete and customer non-solicitation provisions; both must comply with the mandates of La. R.S. 23:921(C)." (citations omitted)).   Accordingly, the statute requires non-compete and customer non-solicitation provisions to specify the "parish or parishes, municipality or municipalities, or parts thereof" in which the employee cannot solicit or compete.   LA. REV. STAT. 23:921(C) (2001).   Thus, the Court must assess whether the customer non-solicitation provision complies with the statute.

The customer non-solicitation provision in the Baumgart Agreement does not include any geographical restrictions.   Recognizing this omission, Diversified argues that the geographical areas listed in the non-competition provision may be imputed to the customer non-solicitation provision.   Doc. 46 at p. 7.   Put another way, Diversified asks this Court to find that the customer non-solicitation provision comports with the requirements of the statute because the employment agreement lists geographical limitations in a separate provision and thus the parties can readily discern the geographical limitations.

Diversified relies on case law from the Louisiana Third Circuit Court of Appeals finding that the failure to specify geographical limitations in a non-compete does not render it void if the parties can readily discern the geographical bounds of the agreement. *See e.g., Monumental Life Ins. Co. v. Landry*, 846 So. 2d 798, 801 (La. App. 3 Cir. 2003); *Petroleum Helicopters, Inc. v.*

*Untereker*, 731 So.2d 965, 968 (La. App. 3 Cir. 1999).   However, other Louisiana Circuits have

disagreed with the Third Circuit.   In *Aon Risk Servs. of La. v. Ryan*, the Fourth Circuit stated:

> We beg to differ with our learned brothers of the Third Circuit. We find that the
> clear language of [Section] 23:921 requires that the agreement specify the parishes.
> If this Court were to adopt the position espoused by the Plaintiff, there would have
> been no reason for the legislature to have included the requirement that the parishes
> be specified.

807 So. 2d 1058, 1060 (La. App. 4th Cir. 2002).   Louisiana's First Circuit likewise disagreed

with the approach taken by the Third Circuit, stating that "*Petroleum Helicopters* goes too far."

*Turner Prof'l Servs., Ltd. v. Broussard*, 762 So. 184, 186 (La. App. 1 Cir 2000).

Additionally, federal courts have declined to adopt the Third Circuit's approach.   *See e.g.*,

*Ferrellgas, L.P. v. McConathy*, No. 10-178, 2010 WL 1010831, at *4 (W.D. La. 2010) ("[W]e

find no reason to conclude that the Louisiana Supreme Court would deviate from the approach

articulated by the majority of the state appellate courts."); *Waguespack v. Medtronic, Inc*., 185 F.

Supp. 916, 930 (M.D. La. 2016) (declining to adopt the Third Circuit's approach and describing

it as a "an outlier circuit."); *Affordable Roofing, Siding, & Gutters, Inc. v. Artigues*, No. CV 16-

16872, 2017 WL 713693, at *2-3 (E.D. La. Feb. 23, 2017).

    The Court finds the approach taken by the majority of appellate courts in Louisiana

persuasive and most indicative of Louisiana law.   Following the reasoning in *Aon Risk*, the

Third Circuit's approach runs counter to the text of the statute as well as the underlying policy in

Louisiana law that restrictive covenants must be strictly construed.   *See Arthur J. Gallagher &*

*Co. v. Babcock*, 703 F.3d 284, 288 (5th Cir. 2012).   As the court in *Affordable Roofing*

explained, adopting the Third Circuit's approach would frustrate the goal of the statute by

incentivizing employers to write overbroad non-compete provisions because courts could cure

any overbreadth.   *Affordable Roofing*, 2017 WL 713693, at *3.   Accordingly, the Court adopts

the majority approach, one that requires "mechanical adherence to the requirements listed in the

law (especially the geographical and time limitations)." *Ferrellgas*, 2010 WL 1010831, at *4 (quoting *Sentilles Optical Servs., Div. of Senasco, Inc. v. Phillips*, 651 So.2d 395, 399 (La. App. 2d Cir. 1995)).

Applying the majority approach to the present matter, the Court finds that the failure to specify geographical restrictions renders the non-compete void.   Due to the statute's requirement that geographical limitations must be specified and the "principle of strictly construing exceptions to the longstanding public policy of [Louisiana] disfavoring agreements not to compete," courts have concluded that "non-solicitation provisions must be able to stand on their own." *Vartech*, 951 So. 2d at 260−61.   As such, when a customer non-solicitation provision fails to conform with the requirements of Section 23:921(C) (2001) by failing to specify the geographical restrictions, courts will decline to reform the non-solicitation provision by inferring the geographical limitations specified in the non-compete provision of the agreement.  *Id.*; *see also Yorsch v. Morel*, 223 So. 3d 1274, 1288 (La. App. 5 Cir. 2017); *Total Safety U.S., Inc. v. Code Red Safety & Rental, LLC*, 423 F. Supp. 3d 309, 314 (E.D. La. 2019) ("Without any specified parish or parishes, municipality or municipalities, or parts thereof . . . the non-solicitation clause cannot stand on its own and, accordingly, cannot be reformed." (internal quotations and citations omitted)).   The Court therefore declines to infer the geographical restrictions from the non-compete into the customer non-solicitation provision.

Additionally, the presence of a severability clause will not save non-compete or customer non-solicitation provisions that do not specify geographical restrictions.  *See Total Safety*, 423 F. Supp. 3d at 314 (declining to use a severability clause to reform a provision that could not stand on its own).   To save such provisions, courts cannot merely strike the offending language, but rather must rewrite the deficient provision.  *See id.* (declining to reform when doing so "would mean rewriting a disfavored contract into compliance with a narrowly drawn statutory

exception").   As one court explained, "if courts always reformed invalid non-competition provisions, employers would be free to routinely present employees with grossly overbroad covenants not to compete."   *L & B Transp., LLC v. Beech*, 568 F. Supp. 2d 689, 694 (M.D. La. 2008) (internal quotations omitted).   Cognizant of these issues, the Court declines to reform the provision.

Therefore, the Court finds the customer non-solicitation provision unenforceable for failing to comport with the requirements of Section 29:921(C) (2001).   Accordingly, Diversified cannot state a breach of contract claim based on a violation of the customer non-solicitation provision and the Court therefore grants Defendants' motion to dismiss as to this claim.

### 2.   "Confidential information" provision

Baumgart's employment agreement includes the following "non-disclosure" provision:

> The Employee recognizes and acknowledges that during his/her employment with the Employer, he/she will have access to and be provided with certain confidential and proprietary business information, including but not limited to, client and customer information, customer lists, and pricing information, all of which are of substantial value to the Employer in its business. The Employee acknowledges that the Employer is engaged in the business of providing business management services to farmers.

Doc. 38-1 at 4.   Defendants argue that this provision does not constitute a non-disclosure provision because "it does not prohibit the disclosure of any information or otherwise restrict Baumgart's conduct in any way."   Doc. 49 at pp. 4–5.   Thus, Defendants contend that Diversified cannot state a claim for a breach of the "confidential information" provision because Baumgart had no contractual obligations under it.

Under Louisiana law, "a contract is an agreement by two or more parties whereby obligations are created, modified or extinguished."   *JMF Med., LLC v. Team Health, LLC*, No. CV 19-837-JWD-SDJ, 2020 WL 5807340, at *19 (M.D. La. Sept. 29, 2020) (quoting La. Civ. Code art. 1906).   Consequently, "the elements of a cause of action for breach of contract are:

15

(1) the obligor's undertaking of an obligation to perform (the contract), (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the oblige." *Id*. (quoting *Denham Homes, L.L.C. v. Teche Federal Bank*, 182 So.3d 108, 118. (La. App. 1 Cir. 2015)).   When interpreting a contract, Louisiana law instructs that if "the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."   *Redstone v. Sipes*, 294 So. 3d 1113, 1117 (La. App. 2 Cir. 2020) (citation omitted).

Non-disclosure provisions found enforceable by Louisiana courts explicitly prohibit the disclosure of confidential information.   For example, the non-disclosure provision in *Austin v. Indus. Oils Unlimited, L.L.C.* states, "[e]mployee agrees not to use or disclose the Company's Confidential Information for his/her own benefit, or for the benefit of anyone other than the Company at any time during or after his/her employment with the Company without the Company's express prior written consent."   No. CV 17-1625, 2020 WL 5834799, at *1 (W.D. La. Sept. 30, 2020); *see also JJ Plank Co., LLC v. Bowman*, No. CV 18-0798, 2018 WL 4291751, at *5 (W.D. La. Sept. 7, 2018) ("During my employment and thereafter, I will not copy, reproduce, disclose, or discuss . . . any Confidential Information . . . ."); *L & B Transp., LLC v. Busby*, No. CIV A 06-310FJPSCR, 2008 WL 4845103 (M.D. La. Feb. 12, 2008) ("[Employee] agrees that [employee] will not knowingly or intentionally . . . divulge, disclose, or communicate any information . . . [and] will protect the information and treat it as strictly confidential.").   Thus, these provisions do more than just make employees acknowledge that they will have access to confidential information; they impose explicit obligations on the employees to protect the confidential information.

Here, the "confidential information" provision does not impose any obligations upon Baumgart.   It simply instructs Baumgart to recognize and acknowledge that he will have access

to confidential and proprietary information as an employee of Diversified.   Moreover, the words in the "confidential information" provision "are clear" and thus "no further interpretation may be made in search of the parties' intent."   *Redstone*, 294 So. 3d at 1117.

Baumgart also cannot rely on the confidentiality provision in the Employee Handbook he signed to state a claim for breach of contract. Doc. 38 at ¶ 43; Doc. 38-2.   Although the Employee Handbook does instruct employees not to disclose confidential information, "Louisiana federal and state courts have consistently held that employee handbooks do not have all four of the elements required for the creation of a contract."   *Hunter v. Jefferson Par. Pub. Sch. Sys.*, No. CV 17-2015, 2017 WL 4619741, at *6 (E.D. La. Oct. 13, 2017) (citations omitted).   Like the handbook at issue in *Pure Air Daigle, LLC v. Stagg*, while Diversified's Employee Handbook sets forth policies and procedures, the violation of which may be grounds for termination, it does not purport to be a binding contract between the parties.   No. CV 6:16-1322, 2017 WL 11534244, at *10 (W.D. La. Jan. 11, 2017); *see* Doc. 38-2.   Additionally, Diversified reserved the right to unilaterally amend the handbook, "which is inconsistent with a finding of a valid contract."   *Id.*; *see* Doc. 38-2 at 29.

In sum, neither the "confidential information" provision nor the employee handbook imposed any contractual obligations upon Baumgart to refrain from disclosing Diversified's confidential information.   Thus, Diversified fails to state a claim for breach of the "confidential information" provision because Baumgart had no contractual obligation he could have breached. Accordingly, the Court grants the motion to dismiss Diversified's breach of contract claim predicated on a violation of the "confidential information" provision.

### B.    Misappropriation of trade secrets

In its second count, Diversified asserts a violation of the Defend Trade Secrets Act, and in its third count a violation of the Missouri Uniform Trade Secrets Act.   To plead a claim under

either statute, Diversified must allege the existence of a protectable trade secret, misappropriation of those trade secrets by Defendants, and damages.    18 U.S.C. § 1836(b)(1); MO. REV. STAT. §§ 417.450-417.467; *Phyllis Schlafly Revocable Trust v. Cori*, No. 4:16CV01631 JAR, 2016 WL 6611133, at *2 (E.D. Mo. Nov. 9, 2016).   Misappropriation of a trade secret "occurs when (1) a person acquires the trade secret while knowing or having reason to know that he or she is doing so by improper means, (2) a person who has acquired or derived knowledge of the trade secret discloses it without the owner's consent, or (3) when a person who has acquired or derived knowledge of the trade secret uses it without the owner's consent." *Cori*, 2016 WL 6611133, at *2.

Defendants argue that Diversified failed to allege that any misappropriation occurred. They claim that the misappropriation claim in this case mirrors the claim dismissed in a separate action involving another former Diversified employee.   *See CGB Diversified Services, Inc. v. Adams*, 2:20-cv-02061-HLT-KGG, Doc. 24 (D. Kan. April 13, 2020).   There, the court dismissed the claim because Diversified simply asserted "that Adams had access to trade secrets as part of his employment with CGB, that he accessed that information, and that he went to work for a competitor."   *Id*. at 6.   Contending that Diversified alleges the same claim here, Defendants argue that this Court should likewise dismiss the claim.

However, *Adams* has limited application here because Diversified's complaint includes much more detail regarding Baumgart and the other former employees' plans to bring trade secrets to Country and QBE Insurance than the complaint in *Adams*.   Here, Diversified alleges specific trade secrets that Baumgart and other former employees intended to bring over to Country and QBE Insurance to aid their business.   Baumgart allegedly sent text messages to Michael Gauer, another former Diversified employee, stating that Country "lack[s] some fundamental things [the former employees] could bring," including a "profit matrix," "DSA

18

indicators," (the meaning of which Diversified does not explain) and "market summary reports," all of which allegedly constitute trade secrets.   Doc. 38 at ¶¶ 99-100.   From these allegations, the Court can reasonably infer that Baumgart possessed the intent to use the trade secrets against Diversified.

Diversified further alleges that shortly before he left, Baumgart downloaded twenty-seven applications containing "confidential information about Diversified's customers and their intentions regarding crop insurance." *Id*. at ¶ 103. The Complaint does not explain whether the term "applications" refers to applications for insurance, software applications, or both (or, for that matter, something else).   Granting all reasonable inferences in Diversified's favor for purposes of this motion, the Court infers the term refers to customer applications for insurance and possibly related software.   He later allegedly "reset [his] laptop before returning it, thereby destroying all data on the laptop including data regarding its use." *Id*. at ¶ 102; *see also id*. at ¶¶ 108–109. Two days later, he began working for Country. *Id*.

The Complaint does lack specifics regarding how Country, QBE Insurance, and Baumgart used those trade secrets or whether Baumgart disclosed the trade secrets.   Diversified simply alleges that "[o]n information and belief, during his Diversified employment, Baumgart used Diversified's trade secret, confidential and/or proprietary information to solicit Diversified's customers in the crop insurance industry for the benefit of [Country]."   Doc. 38 at ¶ 127.   Other allegations regarding misappropriation are likewise based on "information and belief." *See* Doc. 38 at ¶¶ 169, 172, 179, 182.

However, unlike *Adams*, which failed to include "facts that form [Diversified's] 'information and belief,'" the allegations laid out above provide facts that form Diversified's information and belief.   Diversified alleges that Baumgart identified specific "fundamental" trade secrets he could bring over that would benefit Country and QBE Insurance, downloaded

confidential information, wiped his computer, and then departed to work in a similar position for a competitor two days later.   While Diversified bases its allegations that Baumgart disclosed or used this information in competition with Diversified on information and belief, it alleges sufficient facts from which the Court could reasonably infer that Baumgart misappropriated Diversified's trade secrets.   Accordingly, finding that Diversified stated plausible misappropriation of trade secrets claims, the Court denies the motion to dismiss these claims.

### 1.      Missouri uniform trade secrets act preemption

Defendants seek to dismiss Counts IV-XI because they each stem from Baumgart's alleged misappropriation of trade secrets and thus the Missouri Uniform Trade Secrets Act preempts them.   Doc. 43 at pp. 12–14.   The statute provides that "sections 417.450 to 417.467 displace conflicting tort, restitution, and other laws of this state providing civil remedies for misappropriation of a trade secret."   MO. REV. STAT. § 417.463.   "Federal courts have held that this provision preempts 'civil claims[s] that are derivative of a claim of misappropriation of trade secret[s].'"   *Design Nine, Inc. v. Arch Rail Grp., LLC*, No. 4:18 CV 428 CDP, 2019 WL 1326677, at \*5 (E.D. Mo. Mar. 25, 2019) (quoting *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, No. 4:00CV70CEJ, 2002 WL 32727076, at \*4 (E.D. Mo. Feb. 25, 2002)).   Thus, Defendants argue that because Diversified bases its other claims "on facts related the misappropriation of trade secrets," those claims fail as the Missouri Uniform Trade Secrets Act preempts them. *See id*. (quoting *Reliant Care Mgmt., Co. v. Health Sys., Inc*., No. 4:10CV38 CDP, 2011 WL 4369371, at \*1 (E.D. Mo. Sept. 19, 2011)).

At this stage in the litigation, the Court finds it premature to determine which claims fail because of preemption.   For the Missouri Uniform Trade Secrets Act to preempt these other claims, the Court must find that the alleged trade secrets constitute trade secrets as a matter of law.   However, as one court explained, "[w]hile determining whether something is a trade secret

is a matter of law, that legal determination must be based on evidence showing that the claimed secrets meet the statutory definitions." *Id.* Accordingly, courts in this district have deemed it premature to make a ruling regarding preemption at the motion to dismiss stage because the determination as to whether a trade secret exists as a matter of law should wait until summary judgment. *See id.*; *see also Pinebrook Holdings, LLC v. Narup*, No. 4:19CV1562 RLW, 2020 WL 871578, at *8 (E.D. Mo. Feb. 21, 2020); *US Polymers-Accurez, LLC v. Kane Int'l Corp.*, No. 4:17-CV-2371 RLW, 2018 WL 4491168, at *2 (E.D. Mo. Sept. 19, 2018); *Roeslein & Assocs., Inc. v. Elgin*, No. 4:17 CV 1351 JMB, 2018 WL 1138465, at *11–12 (E.D. Mo. Mar. 2, 2018). As such, the Court denies the motion on this basis.

### C.   Tortious Interference Claims

Diversified asserts six counts of tortious interference. Doc. 43 at pp. 41–53. Counts V and VIII assert claims for tortious interference with the Baumgart Agreement against Country and QBE Insurance, respectively. *Id.* at pp. 41–43, 47–49. Counts VI and IX assert claims for tortious interference with Diversified's contractual relations against Country and QBE Insurance, respectively. *Id.* at pp. 43–44, 49–51. Counts VII and X assert claims for tortious interference with Diversified's business relationship and/or expectancy with its customers and agents against Country and QBE Insurance, respectively. *Id.* at pp. 45–47, 51–53.

Under Missouri law, to state a claim for tortious interference with a contract or a business expectancy, one must allege: "(1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." *Rice v. Hodapp*, 919 S.W.2d 240, 245 (Mo. banc 1996) (citation omitted). Defendants argue that Diversified failed to allege an absence of justification for any of its tortious interference claims.

21

"Absence of justification refers to the absence of a legal right to justify the actions taken."   *W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 20 (Mo. 2012) (quoting *Envirotech, Inc. v. Thomas*, 259 S.W.3d 577, 590 (Mo. App. E.D. 2008)).   "If the defendant has a legitimate interest . . . in the expectancy the plaintiff seeks to protect, then the plaintiff must show that the defendant employed improper means in seeking to further only his or her own interests. Improper means are those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or common law."   *Id*. (citing *Stehno v. Sprint Spectrum, L.P.*, 186 S.W.3d 247, 252 (Mo. banc 2006)).   Defendants contend that the alleged interference amounts to the regular business practices of hiring new employees and soliciting business from prospective customers.   Doc. 43 at pp. 9–11.   Because they have an unqualified right to "perform those actions," Diversified must allege Defendants employed improper means, which it failed to do.

Diversified argues that Defendants employed improper means by encouraging the former Diversified employees to violate their restrictive covenants, which they claim qualifies as an independent wrongful act.   Doc. 46 at 10.   Diversified asserts tortious interference claims with its employment contracts with Baumgart and the other former employees, as well as interference with its business relationships.   Doc. 43 at pp. 41–53.   The Court first addresses the claims related to interference with the employment contracts before addressing the claims related to business relationships.

### 1.    Tortious interference with the Baumgart agreement and other employee agreements (Counts V, VI, VIII, and IX)

As an initial matter, Defendants argue that the tortious interference claims involving the Baumgart Agreement must fail because all the relevant provisions of the agreement are unenforceable.   Doc. 43 at 10 n.11.   As such, because a claim for tortious interference with a

contract fundamentally requires the existence of a valid contract, Diversified has no claim as no enforceable contract involving Baumgart could have been interfered with. *Id*. However, while the Court did find certain provisions unenforceable, it also finds the Agreement's employee non-solicitation provision enforceable. The Defendants do not challenge the enforceability of the other employees' contracts and thus the analysis below pertaining to enforceability applies only to Baumgart's contract.

Importantly, the geographical requirements of LA. REV. STAT. § 23:921(C) (2001) do not apply to employee non-solicitation provisions. *See CDI Corp. v. Hough*, 9 So. 3d 282, 292 (La. App. 1 Cir. 2009) (citing *Smith, Barney, Harris Upham & Co. v. Robinson*, 12 F.3d 515 (5th Cir. 1994)); *see also Sabre Indus., Inc. v. McLaurin,* No. 5:19-CV-00934, 2019 WL 3933798, at *6 (W.D. La. Aug. 19, 2019) ("La. R.S. 23:921(C) does not prevent enforcement of a clause or provision prohibiting the solicitation of employees."). Moreover, courts have found employee non-solicitation provisions that last for one year and only bar the solicitation of employees from one's prior employer reasonable. *Id.*; *see also Sabre Indus.*, 2019 WL 3933798, at *6. Accordingly, because the Baumgart Agreement contains an enforceable employee non-solicitation provision and, explained more fully below, the breach of that provision partially forms the basis of Diversified's tortious interference claims, the Court will not dismiss Diversified's tortious interference claims involving the Baumgart Agreement for failure to plead an existing contract.

Diversified alleges that Defendants Country and QBE Insurance interfered with Baumgart and the other employees' employment contracts because they knew about the restrictive covenants in the agreements and encouraged the employees to violate those provisions. For example, Diversified alleges that Defendants knew about the employee non-solicitation provision, but still encouraged the former employees, including Baumgart, to solicit

other Diversified employees in violation of their employment agreements with Diversified.
Doc. 38 at ¶¶ 78, 83–85, 88, 92–94, 128–29, 133–34. Defendants encouraged the scheme by
allegedly agreeing to pay bonuses to Baumgart and the other former employees for soliciting
Diversified employees.   Doc. 38 at ¶¶ 127–29.

Courts have found that aiding the violation of restrictive covenants constitutes
independently wrongful actions sufficient to state a claim for tortious interference.   In *BlueLine
Rental, LLC. v. Rowland*, the plaintiff alleged that the defendant knew that the employees it
wanted to hire had contractual obligations to the plaintiff, but "nonetheless encouraged and
worked with [the employee] to breach them so as to gain a competitive advantage."   No. 1:18-
CV-00195-SNLJ, 2020 WL 1915252, at *4 (E.D. Mo. Apr. 20, 2020).   The court explained that
while "it is not wrongful to simply encourage an employee to join a competitor . . . it would be
wrongful to do so in violation of their restrictive covenants."   *Id*.; *see also* Restatement (Second)
of Torts § 768 (1979) (cmt. i) ("Under these circumstances a defendant engaged in the same
business might induce the employee to quit his job, but he would not be justified in engaging the
employee to work for him in an activity that would mean violation of the contract not to
compete.")

The court reached a similar result in *Custom Hardware Eng'g & Consulting, Inc. v.
Dowell*, 918 F. Supp. 2d 916 (E.D. Mo. 2013).   There, the defendants created a separate
business for their "side-projects," which violated a provision in their employment contracts
"prohibiting, absent written permission from [their employer], self-employment for which
renumeration was received."   *Id*. at 937.   The defendants argued that the "breach was justified,"
because "they had a legitimate interest in forming TriPoint . . . as an entity to funnel all of their
side projects[,] and that no improper means were involved in their creation of a business to
centralize their projects."   *Id*.   The court rejected the defendants' justification argument, finding

24

evidence in the record showed they breached their employment agreements in creating the business. *Id*.   Thus, *Custom Hardware* stands for the proposition that justification does not exist when an employee violates the restrictive covenants in their employment agreement.

Here, Diversified alleges that Country and QBE Insurance encouraged Baumgart and the other former employees to breach the restrictive covenants in their employment agreements.   As the case law demonstrates, those allegations sufficiently assert an absence of justification. Accordingly, the Court finds that Diversified has adequately pleaded its tortious interference with contractual relations claims and therefore denies the motion to dismiss those claims.

### 2.    Tortious interference with Diversified's business relationships and/or expectancy with customers and agents (Counts VII and X)

Diversified argues that it sufficiently pleaded a claim for tortious interference of business relationships because it alleges Country and QBE Insurance encouraged the former employees to poach Diversified's clients and agents in violation of the customer non-solicitation provisions in their employment agreements.   Doc. 38 at ¶¶ 118–21.   Diversified further alleges that Country and QBE Insurance aided the solicitation by working with the former employees to hide their prohibited poaching and that Diversified's customers have already switched over to Defendants. *Id*. at 118–24.   Defendants argue that they had justification to acquire these customers and that Diversified failed to allege they employed improper means.

However, courts have found allegations that a competitor encouraged an employee to breach the customer non-solicitation provision in their employment contract by soliciting their former employer's customers constituted an "independently wrongful act [that] demonstrates a lack of justification." *Church Mut. Ins. Co. v. Sands*, No. 14-CV-3119-S-DGK, 2014 WL 3385208, at *7 (W.D. Mo. July 9, 2014).   In *Church Mutual*, the plaintiff alleged that its competitor hired one of its employees and then interfered with the plaintiff's business

25

relationship by interfering with the employment contract and persuading him to reveal the plaintiff's trade secrets.  *Id*.  The court found that the defendant interfered with business expectancies by causing the plaintiff's client to defect to defendants, "plausibly by inducing [the former employee] to breach his non-compete agreement."  *Id*.

Here, Diversified alleges that the former employees and Country and QBE Insurance have developed a scheme to poach Diversified's clients.   Diversified claims that the former employees have solicited Diversified's clients and then get credit from Country and QBE Insurance for the acquisition.   For example, Diversified alleges that while Gauer understands that the customer non-solicitation provision prevents him from soliciting Diversified's clients in North Dakota, he still interacts with Diversified's clients there and uses another Country employee to run his operations on the ground.   Doc. 38 at ¶¶ 118–19.   Country and QBE Insurance allegedly encourage this behavior in breach of the customer non-solicitation provision in his employment agreement by crediting him for the Diversified clients he brings in.   *Id*. at ¶¶ 119–21.   In sum, Diversified alleges that Country and QBE Insurance reward the former Diversified employees' active solicitation of Diversified's clients, despite knowing the conduct violates the customer non-solicitation provision in the former employees' agreements.

The Court finds these allegations sufficiently state plausible claims for tortious interference of business expectancy against Country and QBE Insurance.   Like the defendant in *Church Mutual*, Defendants' encouragement of the breach of the customer non-solicitation provision by the former Diversified employees constitutes an "independently wrongful act [that] demonstrates a lack of justification."   Accordingly, the Court denies the motion to dismiss the tortious interference with business relationship and/or expectancy claims.

### D.   Civil Conspiracy

Under Missouri law, "[a] 'civil conspiracy' is an agreement or understanding between persons to do an unlawful act, or use unlawful means to do a lawful act." *Oak Bluff Partners, Inc. v. Meyer*, 3 S.W.3d 777, 780–81 (Mo. 1999) (citing *Gibson v. Brewer*, 952 S.W.2d 239, 245 (Mo. banc 1997)).   To state a claim for civil conspiracy, one must plead the following elements: "1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful or overt acts, and (5) resulting damages." *Id*. at 781 (citing *Rice v. Hodapp*, 919 S.W.2d 240, 245 (Mo. banc 1996)).   "[I]f [the] tortious acts alleged as elements of a civil conspiracy claim fail to state a cause of action, then the conspiracy claim fails as well." *Id*. (citing *Rice*, 919 S.W.2d at 245).   The Defendants argue that because Diversified failed to state any viable tort claims, its civil conspiracy claim based on those tortious acts must also fail.

For the reasons explained above, Diversified has pleaded viable tort claims.   Moreover, Diversified's conspiracy claim alleges that Defendants conspired to breach the restrictive covenants in the employment contracts for the purpose of harming Diversified's business, which constitutes a viable civil conspiracy claim under Missouri law.   As one court stated, "[c]onspiracy to breach a contract has long been recognized as a plausible civil conspiracy claim in Missouri.   Similarly, a conspiracy to injure or destroy the trade, business or occupation of another is an unlawful conspiracy." *Envirotech, Inc. v. Thomas*, 259 S.W.3d 577, 587 (Mo. Ct. App. 2008).   Accordingly, the Court finds that Diversified adequately alleged a civil conspiracy claim and therefore denies the motion to dismiss that claim.

For the reasons set forth above, the Court grants, in part, and denies, in part, Defendants' motion to dismiss.   The Court grants the motion to dismiss Diversified's breach of contract claim.   The Court denies the motion as to the remaining claims.

So Ordered this 1st day of December 2020.

_____
**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**